# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

RYAN EARLS                                    CIVIL ACTION

**VERSUS**                                    NO. 11-398

**MEDTEC AMBULANCE CORPORATION**              SECTION "B"(5)

## ORDER AND REASONS

Before the Court is Plaintiff's Motion for Reconsideration (Rec. Doc. No. 266) and the proposed judgment/order from the parties on the issue of remittitur.[1] (Rec. Doc. Nos. 268-69). Accordingly, and for the reasons below,

**IT IS ORDERED** that Plaintiff's Motion for Reconsideration is **GRANTED in part** and **DENIED in part**. The Court adopts neither the remittitur order as proposed by Defendant or the judgment proposed by Plaintiff.

**IT IS FURTHER ORDERED** that the Court adopts the remittitur detailed below.

---

[1] The Court ordered the parties to submit a proposed judgment incorporating the Court's rulings on the issue of remittitur. (Rec. Doc. No. 264). Plaintiff did not do so. Instead, Plaintiff filed a Motion for Reconsideration for remittitur on past medical damages (Rec. Doc. No. 266). Plaintiff's Memorandum in Support of his proposed judgment also contains arguments requesting that the Court modify its rulings on remittitur of future medical expenses. (Rec. Doc. No. 268-2). Defendant did, in fact, comply with the Court's order. (Rec. Doc. No. 296-2). However, Defendant's Memorandum in Support of its proposed order only addresses future medical expenses. (Rec. Doc. No. 269-1). Defendant submitted its arguments on past medical expenses in response to Plaintiff's Motion for Reconsideration. (Rec. Doc. No. 270). Because of the nature of the pleadings before the Court, Plaintiff's Motion for Reconsideration and the parties proposed judgments are addressed together.

## PROCEDURAL HISTORY

Plaintiff filed his action under Louisiana's Products Liability Act in Civil District Court for the Parish of Orleans against Medtec Ambulance Corporation on January 24, 2011. (Rec. Doc. No. 1-1). Defendant removed the action to this Court based on diversity jurisdiction on February 16, 2011 (Rec. Doc. No. 1) and filed its answer on February 23, 2011. (Rec. Doc. No. 4). The City of New Orleans intervened on October 12, 2011. (Rec. Doc. No. 27). On October 26, 2011, Plaintiff filed his First Supplemental and Amended Complaint, adding Lexington Insurance Company and Oshkosh Corporation as Defendants. (Rec. Doc. No. 33). After discovery was conducted, Plaintiff filed his Motion for Summary Judgment on January 20, 2012. (Rec. Doc. No. 79). Defendants Oshkosh and Medtec also filed summary judgment motions on January 24, 2012. (Rec. Doc. Nos. 85, 87). The Court denied both parties' motions and granted Oshkosh's motion for summary judgment (Rec. Doc. No. 189), and the case proceeded to trial.

A jury trial was conducted on April 3-5 and 9, 2012. (Rec. Doc. Nos. 230-31, 233-34). The Court entered judgment in favor of Plaintiff (Rec. Doc. No. 236), which was later amended to allow for interest. (Rec. Doc. No. 257). Subsequently, Defendant filed its Motion to Alter Judgment, Motion for New Trial, and Motion for Judgment as a Matter of Law (Rec. Doc. No. 246), and Plaintiff filed his Motion to Tax Costs (Rec. Doc. No. 247).

The Court heard oral arguments on Defendant's Motions on June 27, 2012. (Rec. Doc. No. 263). At that time, the Court granted in part and denied in part Defendant's Motion for Remittitur, denied Defendant's other motions, and further ordered that the parties submit a proposed judgment incorporating the Court's rulings on the issue of remittitur. (Rec. Doc. No. 264). Currently pending before the Court is Plaintiff's Motion for Reconsideration (Rec. Doc. No. 266) and the proposed judgment/order from the parties on remittitur. (Rec. Doc. Nos. 268-69).

## LAW AND ANALYSIS

### A.    Past Medical Expenses

A motion for reconsideration may be made under either Federal Rule of Civil Procedure 59(e) or 60(b). *Shepherd v. Int'l Paper Co.*, 372 F.3d 326, 328 n. 1 (5th Cir. 2004). Such a motion must "clearly establish either a manifest error of law or fact or must present newly discovered evidence. These motions cannot be used to raise arguments which could, and should, have been made before the judgment issued." *Ross v. Marshall*, 426 F.3d 745, 763 (5th Cir. 2005), citing *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir. 1990). In considering a motion for reconsideration, a court "must strike the proper balance between two competing imperatives: (1) finality, and (2) the need to render just decisions on the basis of all the facts." *Edward H. Bohlin Co. v. Banning Co.*, 6 F.3d 350,

3

355 (5th Cir. 1993). A Rule 59(e) motion should not be granted unless the plaintiff can show: (1) an intervening change in controlling law; (2) the availability of new evidence previously not available; or (3) the need to correct a clear error of law or fact or to prevent a manifest injustice. *Schiller v. Physicians Resource Group, Inc*., 342 F.3d 563, 567 (5th Cir. 2003). A court may grant a motion to reconsider on the basis of newly discovered evidence only if: (1) the facts discovered are of such a nature that they would probably change the outcome; (2) the facts alleged are actually newly discovered and could not have been discovered earlier by proper diligence; and (3) the facts are not merely cumulative or impeaching. *Infusion Resources, Inc. v. Minimed, Inc.*, 351 F.3d 688, 696-97 (5th Cir. 2003).

Awards of past medical expenses are judged as special damages and must be based upon some reasonable amount of medical information. *Mack v. Wiley*, 07-2344 (La.App. 1st Cir. 5/2/08); 991 So.2d 479, 489. Certainly, the plaintiff is entitled to his past medical expenses as an award, but only those medical expenses that have been proven and that have been established and introduced into the record.

In this particular case, the jury returned a verdict for past medical expenses of $40,000.00. The amount established at trial was supported, in part, by the stipulation entered by the City of New Orleans and other medical evidence submitted to the jury. The issue

4

now is what amount of past medical expenses was before the jury and what amount, if any, should be remitted from the jury's award. (*See* Rec. Doc. No. 270, pp.2-3).

The Workers' Compensation stipulation is an agreement between Plaintiff and the City of New Orleans that the City is entitled to, *inter alia*, reimbursement of $19,437.17 in medical benefits. (Rec. Doc. No. 266-3). While Plaintiff claims that the stipulation excused him from proving those items during trial (Rec. Doc. No. 266-1, p.1), Defendant points out that the stipulation was between Plaintiff and the City, and, thus, the Workers' Compensation stipulation does not excuse Plaintiff from proving to the jury the amounts he incurred in past medical expenses based upon some reasonable amount of medical testimony. (Rec. Doc. No. 270).

The stipulation, while a part of the record (Rec. Doc. No. 220), was never introduced to the jury or made part of the trial evidence. (Rec. Doc. No. 234-5). An independent review of the record evidence, including trial testimony and exhibits, **supports an award of $20,179.10[2]** for past medical expenses:[3]

1.    $2,048.28 Tulane University Hospital (P14);

2.    $230.00 Dr. Joshua Kaufman (P61);

---

[2] The $830.00 difference between the present amount and the one originally ordered by the Court ($19,349.10) is accounted for in the bill of Dr. Troy Beaucoudray. Defendant has represented that bill to be $1,400.00 but a calculation of the charges in Plaintiff's Exhibit 65 (Rec. Doc. No. 266-10) actually reflects a total amount billed of $2,230.00.

[3] The bill from Healthport in the amount of $34.26 is not a medical expense, but a cost for reproduction of medical records.

3.  $3,650.00 Dr. Neil Baum (P62);

4.  $1,935.82 Dr. Charles Aprill (P67);

5.  $5,000.00 Dr. Fred Defrancesh (Rec. Doc. No. 237, p.228);[4]

6.  $2,230.00 Dr. Troy Beaucoudray (P65);

7.  $2,725.00 Dr. Scott Griffies (P64);

8.  $1,160.00 Dr. Richard Meyer (P63);

9.  $1,200.00 Dr. Bradley Bartholomew (Rec. Doc. No. 237, pp.247-
    48).

Based on the above, the Court revises its earlier ruling and
finds that Medtec is entitled to a remittitur of $19,820.90 for
past medical expenses. ***Therefore, Plaintiff is entitled to an
award of $20,179.10 for past medical expenses***.

B.  **Future Medical Expenses**

Under Louisiana law, the plaintiff must establish the amount
of the award with some certainty in order to recover for future
medical expenses. *Veazey v. State Farm Mut. Ins. Co.*, 587
So. 2d  5 (La. App. 3 Cir. 1991). An award for future medical
expenses "will not be made in the absence of medical testimony that
they are indicated and their probable cost." *Id.* at 8 (internal
quotation marks and citation omitted). Future medical expenses,
like any other damages must be established with some degree of
certainty. The plaintiff must show that, more probably than not,

---

[4] Dr. Defrancesh testified that his bill was around $5,000.00. The bill
Plaintiff submitted in his Motion for Reconsideration (Rec. Doc. No. 266-12)
encompassed these services, but was not shown to the jury or admitted into
evidence at trial. (Rec. Doc. No. 270, p.4).

these expenses will be incurred. "*An award for future medical expenses cannot be based on mere speculation of the jury*. Much stronger proof, such as medical testimony of the specific expenses to arise, should be required for such an award." *Id.* (emphasis added). According to the Fifth Circuit, "The jury may select the highest figures that the evidence will support, however, the jury may not speculate on damages where calculation of the damages is definable." *Brunneman v. Terra Intern., Inc.*, 975 F.2d 175, 178.

Plaintiff contends that the Court's judgment should reflect an award of $539,574.00 for future medical expenses. (Rec. Doc. No. 268-1 at 2-3). Further, Plaintiff notes that Defendant conceded that the trial record supports an award of at least $155,729.58 for future medical expenses. (Id., at Exh. 1). Future medical expenses must be supported by medical testimony adduced at trial, as such, the analysis below concentrates on the medical evidence produced at trial regarding Plaintiff's future medical expenses.

### Dr. Bartholomew

First, Plaintiff submits the trial testimony of Dr. Bradley Bartholomew supports a reasonable medical probability of $204,704.00 in future medical expenses. (Id. at 3). Dr. Bartholomew testified that Plaintiff's spine is damaged and that he is more predisposed to having significant degradation of the spine, and accordingly, recommended a three-level IDET procedure to

alleviate Plaintiff's pain.[5] Defendant concedes a lifetime cost of $9,500.00 for the IDET procedure. (Rec. Doc. No. 269).

Dr. Bartholomew further testified that based upon the nature of Plaintiff's injuries and the results of the discogram,[6] Plaintiff should undergo lumbar fusion. Medical expert testimony supports a total cost of $100,000.00 for said operation, hospital and surgeon fees, and the requisite instrumentation.[7] Additionally,

---

[5] Q: So is it, based on a reasonable medical probability, that this man's spine is now damaged and he is more predisposed to having significantly degradation or wearing down of his spine?

A. Yes, sir.

Q: Q. Is it your opinion, then, that he is a candidate and should have an IDET procedure, which is a surgical procedure that you do, correct?

A. That's what I would recommend, yes, sir.

Q. Do you recommend a three-level IDET procedure?

A. Yes, sir. Normally we try not to do three levels, but the fact is he has pain at all three levels. The procedure is what we call minimally invasive. It's done through a big needle. So while he's in the hospital, while he's getting it done, I prefer to do all three at one time as opposed to doing one, see if he gets better, bringing him back and doing another, et cetera.

Q. Is it fair to say your general fee, I believe, i[s] $9,500 just for this particular test, plus hospitalization, which is another bill?

A. Yes, sir. (Trial Trans. 240; 5-8; 238; 20-25-239;1-10).

[6] Plaintiff had a discogram performed *before* trial, and accordingly said cost is not calculated in future medical expenses. (Trial Trans. 89: 4-7).

[7] Q. Now, based on what you know, the fact that he definitely should have an IDET procedure, is it fair to state that, based on a reasonable medical probability, that means more likely than not, that this gentleman will be and is a candidate down the road for a lumbar fusion?

A. Because of the fact that he's so young and so many levels are involved, I do think he's going to require a bigger operation in the future as he gets those accelerated -- quote/unquote, accelerated degenerative change. With the technology we have today, that operation would be a fusion.

Q. Would you tell the jury, *I believe I have heard you say*

Dr. Bartholomew testified that "[a] fusion, as I talked about, would go up another $25,000 from that high number there." (Trial Trans. at 259; 2-5).   Defendant contends there was no trial testimony supporting Plaintiff's need for lumbar fusion because Dr. Bartholomew testified that the need for this procedure would be speculative based upon his hope that the IDET procedure would grant Plaintiff relief.[8]  (However, there is medical testimony by way of Dr. Bartholomew's testimony, albeit minimal, supporting the need for said operation.).  Therefore, per Dr. Bartholomew's tenuous testimony, Plaintiff's lumbar fusion operation would total approximately $125,000.00.

Regarding Plaintiff's need for MRI scans,  Dr. Bartholomew testified that Plaintiff will not need an MRI every two to three

_____

*that you're looking at -- for a lumbar fusion it is $100,000 just for fee for that?*

*A. Between the hospital, all the instrumentation that goes in and the surgeon's fee, yes, sir.*

*Q. Is it fair to state, based on what you know from the discogram, it's more likely than not, because he's a young man with this type of ongoing problem, you said he'll need it?*

*A. Yes, sir. But not just based upon the discogram.* Again, based upon his age and so many discs being involved.(emphasis added)(Trial Trans. 241:4-22).

[8] At this point, obviously, the hope is for Mr. Earls to undergo the IDET procedure, and he will have significant relief and not ever have to undergo a spinal fusion; is that correct?

A. That's my hope, yes, ma'am.

Q. So the idea that there might be a spinal fusion at this point is difficult to predict and it would be speculative?

A. Yes, ma'am.
(Trial Trans. 256; 7-14).

years. (Trial Trans. 255; 8-9) ("No, I don't think he's going to require an MRI every two to three years."). Furthermore, Dr. Meyer testified that Plaintiff's need for such services would depend on his condition "down the road." (Trial Trans. 782: 12-21). Therefore, there was no immediate expert medical testimony to support Plaintiff's argument that an MRI would have to be conducted before each operation. As such, the Court in its June 27, 2012 hearing determined that Plaintiff would only need two MRIs for the next two years at a cost of $1,246.00 per procedure, for a total of $2,492.00. (Hearing Trans. 81; 18-24).

Dr. Bartholomew further testified that Plaintiff would need physical therapy, totaling $17,085.00,[9] if he has flare ups, and per the Court's time period of three years post trial that totals $51,255.00. (Rec. Doc. No. 268 at 6); (Trial Trans. 255-256); (Hearing Trans. 83; 1-9). Accordingly, there is expert medical testimony to support a finding of $51,255.00 for Plaintiff's future physical therapy.

Additionally, Dr. Bartholomew testified that Plaintiff may need one to three future visits with Dr. Bartholomew, totaling $1,500.00 for said visits. Moreover, Defendant has no objection to Plaintiff's need to visit Dr. Bartholomew in the future and lists

---

[9] A: I can usually tell you that people with back problems generally will have flare-ups once or twice a year that may require -- or usually does require a course of therapy because it hasn't responded to conservative measures. So I would say maybe twice a year a three-week course. It's usually three times a week, three weeks is nine visits, twice a year, so 18 visits. (Trial Trans. 255; 20-25- 256; 1-3).

$1,500.00 for these visits, in accordance with the Court's June 27, 2012 rulings. (Rec. Doc. No. 269-1 at 5).

Finally, regarding the facet block procedure, Dr. Bartholomew testified that he had performed said procedure before trial, because he wanted to "do the least invasive or smallest thing first." (Trial Trans. 236; 15-19). But, the results of said procedure were not conclusive, and, thus, Plaintiff underwent a discogram. (Id. at 237; 5-21). The Court in its June 27, 2012 hearing found that immediate medical expert testimony on Plaintiff's need for future facet block testing was lacking. However, the Court ultimately determined that because Dr. Bartholomew initially ordered such testing, there was some minimal evidence for a once a year procedure at $3,000.00 for a total of $6,000.00 for a two-year period.[10] Finally, based on the accumulation of medical testimony, the Court in its June 27, 2012 hearing determined that it saw the need "down the line" for the hepatic panel, but not at the frequency cited by life care plan specialist Carla Seyler. As such, the hepatic panel is estimated

---

[10] THE COURT: Dr. Bartholomew had, indeed, ordered the initial facet blocks, so apparently he felt as if there was some need for it at one point or another. The idea that there is record evidence of a need for it would suggest that that need would be something, at least for a period of time here of, again, based upon the record evidence, a two-year period. If you look at the two-year period, then you're looking at the $3,000 cost for that, for a total of $6,000. (Hearing Trans. 80; 4-11).

to be needed twice a year, for a yearly cost of approximately $54.00, totaling $108.00 for a two-year post-trial period.[11]

**Given this, Dr. Bartholomew's expert medical testimony, in conjunction with the Court's findings for a two-year post-trial period, supports future medical expenses totaling $195,855.00.**

### Dr. Baum

Second, Plaintiff's urologist, Dr. Neil Baum, testified that he believed Plaintiff's urinary and sexual dysfunction problems were related to his low-back injury.[12] He further testified that Plaintiff will need a urologist's treatment at least twice a year for the rest of his life.[13] However, Dr. Bartholomew testified that

---

[11] Regarding the urinalysis, while the Court noted that it may be important, it also questioned the existence of medical testimony to support same. There is no medical testimony to support this medical expense. (Hearing Trans. 45; 11-23).

THE COURT: MRI scans, I mean, that's -- I think, out of perhaps most of these itemized issues here on future medical costs, I didn't see the medical testimony here that supports her frequency. I saw the need for it down the line, based upon the testimony of some of the doctors, but not the frequency that she puts it at. The same thing on the hepatic panel. The urinalysis, I did see that. Again, I think that that's important. Now, a question about medical support for that and the cost for that is another question. The test for erectile dysfunction, or ED, the NPT, the urodynamic testing, none of these were, according to the evidence, performed prior to trial. (Hearing Trans. 45; 11-23).

[12] Q. Would you agree that if Mr. Earls' urinary and sexual dysfunction problems are not related to his low-back injury then they should not be in a life care plan for him?

A. But I do feel that they are related. (Trial Trans. 346; 14-17).

[13] THE COURT: Can you give a reasonable expectation of how often would he need to see you or someone in your field?

THE WITNESS: *It is likely that he will have to return to see a urologist every six months, or at least once a year for the rest of his life*. He will also have to have periodic examinations consisting of a serum testosterone level to

12

he estimates Plaintiff's back injuries to improve once the IDET procedure is performed.[14] Thus, Dr. Baum's testimony that he believes Plaintiff's lower back injuries are related to his urological issues, taken in conjunction with Dr. Bartholomew's testimony that he expects Plaintiff's injuries to improve after the IDET procedure, provide medical testimony to support the Court's June 27, 2012 finding that Plaintiff will need to see a urologist twice a year for the next two years.[15] Dr. Baum's rate is approximately $135.00 per visit, with two visits each year for two years total, Dr. Baum's fees are $540.00.[16]

---

follow up to see if he needs supplemental testosterone. So I would say an evaluation by a urologist minimum every six months. (emphasis added)(Trial Trans. 313 12;21).

[14] Dr. Baum also testified that currently Plaintiff does not display the need for urinalysis:

THE COURT: Briefly, Counsel, because I think that's the key thing he's gotten in.
One other question I had for you, Doctor, before I forget. I heard mention of various tests, including tests dealing with testosterone levels, glucose, etcetera. Would tests for any type of sexually transmitted disease be relevant in terms of your diagnosis here?

THE WITNESS: *If he had symptoms of a urethral discharge, if the urinalysis was abnormal, that's a screening test for sexually transmitted diseases, I would think that would be in order, but based on his symptomatology and the negative urinalysis, no, I don't think so.* (emphasis added) (Trial Trans. 316; 1-12).

[15] THE COURT: Looking at it from the perspective of what we had, at least in the past, by Dr. Baum, to trial, as well as his testimony on the future in that regard, it would appear, then, that a period of two years would be more probable than not from the medical evidence that we have from Dr. Baum. (Hearing Trans. 78; 13-17).

[16] "At an assumed rate of $135, Dr. Baum charges for his services today, . . . ." (Rec. Doc. No. 268 at 7).

13

Dr. Baum also testified about Plaintiff's pharmaceutical needs. He testified that Plaintiff will regularly need Vesicare to treat his bladder condition for a "long, long time."[17] Each tablet is approximately $3.00 per pill, for a total of $100.00 per month, for a yearly total of $1,200.00 for Vesicare. Per the Court's two-year post-trial time span, medical evidence supports a finding of $2,400.00 for Vesicare for Plaintiff.

Furthermore, Dr. Baum testified about Plaintiff's need for Viagra to treat his erectile dysfunction.[18] Dr. Baum did testify that "[Plaintiff] will need some assistance in order to engage in intimacy, and Viagra or one of the class of drugs like Viagra is -- should be highly effective in this man." (Trial Trans. 318; 6-9). However, Dr. Baum did not definitely testify as to how often

---

[17] Q: And is it going to be necessary for him to take a medication called *VESIcare* for the rest of his life, in your opinion?

A. VESIcare or a drug in that class. (Trial Trans. 317;9-12).

[18] Q. And is it your opinion no matter whether these symptoms gets excellent or not excellent, he still will be, as we sit here today, likely to take the Viagra for the rest of his life?

A. It is more likely than not that he will need some assistance in order to engage in intimacy, and Viagra or one of the class of drugs like Viagra is -- should be highly effective in this man.

Q. Would you agree that on a monthly basis $300 for these medications would be a reasonable cost?

A. For both?

Q. For both?

A. Definitely. Yes. (Trial Trans. 318; 3-14).

Plaintiff will need to take Viagra or the attendant costs for such medication.[19] He just testified that the monthly cost will be about $300.00 per month for both Vesicare and Viagra. (Id.). Therefore, subtracting the Vesicare estimate of $100.00 per month (Trial Trans. 317; 21-24) as estimated by Dr. Baum, from the $300.00 per month medical estimate for both Vesicare and Viagra leaves $200.00 a month, approximately, for Viagra. Thusly, $200.00 a month for two years post trial is $4,800.00 for said medication.

**Given this, Dr. Baum's medical testimony supported future medical expenses of $7,740.00 for Plaintiff's condition for the next two years after trial.**

**Dr. Kaufman**

Third, Dr. Joshua Kaufman testified regarding the area of physical medicine and rehabilitation. Dr. Kaufman testified that Plaintiff will need a lumbosacral arthrosis (back brace), if Plaintiff found it beneficial. But, at the time of trial Dr. Kaufman had not ordered such.[20] Yet, Dr. Bartholomew testified that a

---

[19] Q. Would you agree that on a monthly basis $300 for these medications [Vesicare and Viagra] would be a reasonable cost?
A. For both?
Q. For both?
A. Definitely. Yes. (Trial Trans. 318; 10-13).


[20]
Q. You're familiar with the life care plan created by Carla Seyler, and you had just seen a copy of it. I believe plaintiff's counsel just showed it to you.
In that life care plan it says that Mr. Earls will need a new lumbosacral arthrosis every five years.

patient would need such a medical device after a lumbar fusion procedure.[21] ("They have to wear a brace for three months.") (Trial Trans. 237;13-21). A lumbosacral arthrosis costs approximately $45.00. Dr. Kaufman also reported to the life care plan specialist, Carla Seyler, that Plaintiff would need a new seating system every three years.[22] However, he did not give clear medical testimony supporting his recommendation for same at trial. He merely referenced that her life care plan included such medical device. Finally, Dr. Kaufman testified that Plaintiff will need psychiatric services, but not for the rest of his life.

---

And a lumbosacral arthrosis is basically a back brace, right?

A. That is correct. That is only true if he finds it beneficial.

Q. Have you ever ordered one for him?

A. I have not. (Trial Trans. 379; 22-25; 380; 1-4).

[21] Q. What would be his -- assuming that the surgery is successful, which he's looking at looming down the road, what would be his future in terms of trying to rehabilitate? What type of rehabilitation would he be expected to go through?

A. He likely would require a good two or three months of physical therapy after a fusion. It takes -- I tell patients they are going to hate me for a month, wonder why they had it done and swear I did something wrong. They have to wear a brace for three months.(Trial Trans. 237;13-21).

[22] Q. And you also said that he needed a new seating system, whatever that is, every three years. You stated that, correct?

A. I believe that that would be beneficial for him.

Q. Have you ever ordered that?

A. Not for Mr. Earls. (Trial Trans. 380;5-9).

Accordingly, the Court found that for a two-year post-trial period $1,040.00 total would suffice for such services.[23]

**Given this, Dr. Kaufman's medical testimony supports future medical expenses totaling $1,085.00, assuming Plaintiff would need a lumbosacral arthrosis.**

### Dr. Meyer

Fourth, Dr. Richard Meyer testified as an orthopedic specialist. He testified that Plaintiff will need the services of an orthopedic specialist.[24] However, Defendant contends Dr. Meyer's testimony regarding Plaintiff's need for an orthopedist is speculative.[25] Dr. Meyers' testified that Plaintiff will need

---

[23] THE COURT: In that regard, given the entire record from the time of the injury to the time of trial, the Court finds that there is record evidence for, perhaps, a need for seeing a psychiatrist for a two-year period posttrial, which would then equate to an award of $1,040, which is remittitur, then, off of the $26,000 that the life care planner attributes for those services. (Hearing Trans. 77; 5-11).

Q. You never told Ms. Seyler that the items that were listed on her report that were attributed to you, that Mr. Earls would need those for the next 50 years, did you?

A. I don't believe I specified that.

Q. Wouldn't you agree that no one can predict what Mr. Earls' condition will be and what he will need three years from now, much less 50 years from now?

A. I think that it's difficult to do so. (Trial Trans. 380; 10-19).

[24] A: The patient may require additional studies, to include an MRI every two to three years, as well as EMG studies. Follow-up visits will be required as often as every four months, particularly if he requires the use of medications. His medications at this time include Ultram and Skelaxin; although, he is also being managed at times on Neurontin and Cymbalta. (Trial Trans. 730; 14-20).

[25] Defendant incorrectly referenced trial testimony to argue that Dr. Meyer's testimony was speculative. Defendant cited Trial Trans. 461; 7-9, but this transcript citation is to Carla Seyler's testimony. (Rec. Doc. No. 269-1).

follow up visits three times a year.[26] Such medical visits are approximately $468.00 per year, totaling $936.00, which comports with the Court's June 27, 2012 ruling of $1,000.00 for future orthopedic expenses.[27]

As such, Dr. Meyers' testified to Plaintiff's pharmaceutical need for Ultram, which is approximately $850.00 per year for a two-year post-trial total of $1,700.00.[28] Additionally, he testified to Plaintiff's current usage of Neurontin and Cymbalta, which annually average $1,381.00 and $2,507.00 respectively, and for a two-year period, total $2,762.00 for Neurontin and $5,014.00 for Cymbalta. Moreover, Dr. Meyer testified that when he initially observed Plaintiff, he prescribed Flexeril, a muscle relaxant. Therefore, the Court in its June 27, 2012 hearing found that Plaintiff may need such medication within the next two years after trial.[29] Such

---

[26] A: The patient may require additional studies, to include an MRI every two to three years, as well as EMG studies. Follow-up visits will be required as often as every four months, particularly if he requires the use of medications. His medications at this time include Ultram and Skelaxin; although, he is also being managed at times on Neurontin and Cymbalta" (Trial Trans. 730; 14-20).

[27] THE COURT: The medical evidence would show in this particular case, to a reasonable medical probability, the annual cost that she assessed for that at $468 per year; but, in my view, based upon the medical evidence here, again, of two years, that would be a thousand dollars. (Hearing Trans. 77; 24-25; Hearing Trans. 78;1-3).

[28] Rec. Doc. No. 269-1 at 10.

[29] Q. Have you prescribed any medication for Mr. Earls?

A. Yes. When he initially presented, he was given Flexeril, which is a muscle relaxant. And we have given him anti-inflammatory medications that have drugs such as Naprosyn or Naproxen in them, but those -- those were the extent of the medications that I prescribed. (Trial Trans. 738; 6-11).

18

muscle relaxers are estimated at $687.00 per year, for a total of $1,374.00 for two years post trial.

The Court also ruled that the need for sleep aids and NSAID medication were reasonable, given Plaintiff's medical condition for the next two years post trial. NSAID is approximately $390.00 a year, and sleep aids are approximately $3,260.00, totaling $780.00 for two years of NSAID, and $6,520.00 for sleep aids.[30] **Given this, Dr. Meyer's testimony supports future medical expenses of $19,150.00.**

**Dr. Griffies**

---

THE COURT: The muscle relaxer, I could see that that would be a need in terms of the medication. In terms of all the medications, I could see that there may be a need for all these medications, but I didn't see medical evidence -- again, maybe that will be pointed out to me -- that it would be needed at the frequency that the life care planner gives. I don't know where she's getting the frequency information from and, to some extent, the cost information from. (Hearing Trans. 46; 15-22).

[30] THE COURT: The muscle relaxer, I could see that that would be a need in terms of the medication. In terms of all the medications, I could see that there may be a need for all these medications, but I didn't see medical evidence -- again, maybe that will be pointed out to me -- that it would be needed at the frequency that the life care planner gives. I don't know where she's getting the frequency information from and, to some extent, the cost information from. (Hearing Trans. 46; 15-22).

The Court did take issue with the life care planner's estimate for sleep aid medication:

THE COURT: Medication consistent with the physician visits for one or two years, again, in my opinion, based upon the medical evidence, at least -- not my opinion, but the medical evidence here, would have it at a two-year cost of $5,000. I believe there is medical record evidence for all the other medications except, however, for the sleep aid at the level that the life care planner suggests of 30 a month, $3,200 a year, for a lifetime of $163,000. There is no medical evidence to support that. (Hearing Trans. 85; 3-11).

Finally, Dr. Griffies testified as Plaintiff's psychiatrist. Dr. Griffies testified that Plaintiff's psychiatric condition warrants the need for antidepressants like Cymbalta.[31] That expense was accounted for through Dr. Meyer's testimony. Finally, Dr. Griffies testified about Plaintiff's need for future psychiatric care. Accordingly, the Court in its June 27, 2012 hearing found there was medical testimony supporting psychiatric services for an annual cost $520.00.[32] However, the psychiatric visit expense was accounted for above, via Dr. Kaufman's medical testimony.

*Accordingly, expert medical testimony supports a finding of $223,830.00 for Plaintiff's future medical expenses.*

---

[31] A: The second thing that really worries me is -- really has to do with the medical reports. If he indeed has -- if he's got a chronic nerve damage to the nerves that go to his bladder and to his erectile function, I think that for a young man, that's going to be a very significant stressor for him, and it's going to complicate his recovery from his depression. (Trial Trans. 503; 11-16).

[32] The life care provider, however, speaks of a need to see a psychiatrist four times a year, for a lifetime cost of $26,000, with an annual cost for psychiatric services of $520. The medical evidence does not support the life care planner's proposal to the jury here; and, at best, from my assessment of the psychiatrist's testimony, combined with all other medical testimony, there is going to be a future need for psychiatric care, but not to the extent that the life care planner, Ms. Seyler, gives this jury.
In that regard, given the entire record from the time of the injury to the time of trial, the Court finds that there is record evidence for, perhaps, a need for seeing a psychiatrist for a two-year period posttrial, which would then equate to an award of $1,040, which is remittitur, then, off of the $26,000 that the life care planner attributes for those services. (Hearing Trans. 76; 20-25; 77; 1-11).

For the reasons articulated herein and during the June 27, 2012 hearing, **IT IS ORDERED** that the award of past medical expenses is **remitted from $40,000.00 to $20,179.10**, and the award of future medical expenses is **remitted from $600,000.00 to $223,830.00**.

**IT IS FURTHER ORDERED** that Plaintiff has fourteen (14) days to **accept judgment in the amount of $1,150,729.10[33]** based on remittitur in this matter. In the event Plaintiff does not accept this amount as remitted, new trial on the issue of damages will be granted.

**Accordingly for the reasons articulated above, IT IS ORDERED** that Plaintiff's Motion for Reconsideration be **GRANTED in part** and **DENIED in part** and that the Court adopt neither the remittitur order as proposed by Defendant or the judgment proposed by Plaintiff. **IT IS ORDERED** that the remittitur detailed above be carried out.

New Orleans, Louisiana, this 27th day of September, 2012.

_____

UNITED STATES DISTRICT JUDGE

---

[33] Past medical damages: $20,179.10
Future medical damages: $223,830.00
Past lost wages: $6,720.00
Loss of earning capacity: $200,000
Past and future pain and suffering: $700,000